UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| T-MOBILE USA, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3: 08-36-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DAVID ARMSTRONG, Chairman, | ) | |
| JAMES W. GARDNER, Vice Chairman, | ) | |
| JOHN W. CLAY, Commissioner, in their | ) | **MEMORANDUM OPINION** |
| official capacities as Commissioners of the | ) | **AND ORDER** |
| Kentucky Public Service Commission, et | ) | |
| al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Plaintiffs' request for reversal of certain decisions issued by the Kentucky Public Service Commission (the "Commission"). Plaintiff wireless carriers are involved in a dispute with landline, or rural local exchange carriers, concerning their respective obligations under the Telecommunications Act of 1996. For the reasons discussed herein, the Court will grant the Plaintiffs' request, in part.

**I.     Discussion**

Landline telephone service providers and wireless telephone service providers in Kentucky are engaged in the difficult task of deciphering the interconnection-related demands of the Telecommunications Act of 1996 ("1996 Act"). The twelve landline providers (collectively, "RLECs") at issue are mostly member-owned cooperatives, with many serving

rural and underdeveloped portions of Kentucky.  With the advent of widespread cellular phone usage, Plaintiffs T-Mobile, Verizon Wireless, Sprint PCS, and AT&T Mobility (collectively, "the Wireless Carriers") have sought to interconnect with the RLECs' telecommunications facilities, pursuant to § 251 of the 1996 Act.  Interconnection allows these newcomers to the market to capitalize on already-existing telecommunications facilities for the joint transportation of telecommunications traffic.  The 1996 Act encourages competition by providing such benefits for these new entrants to the market.  However, negotiations regarding the terms of this interconnection have proved contentious, leading to arbitration and petitions before the Commission.  In May and June of 2006, the RLECs filed 49 petitions against the Wireless Carriers with the Commission.  Through these petitions, the RLECs disputed rates, terms, and conditions for the transport of telecommunications traffic.

Following a hearing, order, and subsequent re-hearing, the Commission issued a consolidated, final decision on all of the petitions.  *See Order*, Case Nos. 2006-00215, et al. (Ky. Pub. Serv. Comm'n, Mar. 19, 2007) [hereafter, the *March 2007 Order*]  The RLECs and Wireless Carriers incorporated the Commission's findings into their subsequently-negotiated interconnection agreements and the Commission approved these agreements.  Shortly thereafter, the Wireless Carriers filed this litigation pursuant to § 252(e)(6) of the 1996 Act challenging the following three determinations that lay at the heart of the Commission's *March 2007 Order*: (1) Wireless Carriers are required to use a specific method of interconnection once the amount of telecommunications traffic exceeds a certain level; (2) RLECs are not responsible for paying telecommunications transport costs outside of their network boundaries; and (3) certain traffic,

-2-

known as "IXC" traffic, is not subject to reciprocal compensation between the RLECs and Wireless Carriers.  Each of these issues are addressed below.

### A.     The Wireless Carriers' Requested Method of Interconnection

Generally, a telecommunications carrier has a duty to directly or indirectly connect with other carriers' networks to provide service.  47 U.S.C. § 251(a).  In other words, a new carrier may transport telecommunications traffic directly to the incumbent carrier, or they may choose to route it through a third-party carrier.  Then, the new carrier's telecommunications traffic can be delivered to customers of the incumbent carrier from either the incumbent or third-party carrier.  Here, the parties dispute the method of this delivery.

The Wireless Carriers originally interconnected indirectly with the RLECs by sending telecommunications traffic through a third party, AT&T Kentucky, and then on to the RLECs through a single "trunk" or conduit.  Thus, all the phone calls made from the Wireless Carriers' customers were sent to AT&T Kentucky, and then through one trunk for transmission to all of the twelve separate RLECs.  However, in the *March 2007 Order*, the Commission found that the use of one trunk for the traffic of all twelve RLECs was not economically reasonable.  The Commission ordered the Wireless Carriers to use "dedicated," or, individual, trunks to give each individual RLEC its own conduit containing only its telecommunications traffic.  The Wireless Carriers argue that this decision violated their right to choose the form of interconnection used by forcing them to connect directly – rather than indirectly – with the RLECs.

The RLECs have a duty to provide the type of interconnection "reasonably requested" by the Wireless Carriers.  *See* 47 C.F.R. § 20.11(a).  This duty is eliminated, however, if the type

of interconnection requested is "not technically feasible or economically reasonable." *Id*. Echoing this language, the RLECs argue that the Wireless Carriers' requested form of interconnection – the use of a single trunk to transport telecommunications traffic for each of the twelve RLECs – is not economically reasonable, thus justifying the Commission's determination. When traffic for multiple RLECs is combined into one trunk, it is difficult for an individual RLEC to ascertain exactly which traffic is routing to its own customers for purposes of billing and identification. [Record No. 32, p. 13-14] With dedicated trunks, the RLECs have the capacity to control and bill for their own traffic instead of having to rely on the third party (*i.e.*, AT&T Kentucky) to properly identify and apportion the traffic going to each separate RLEC. The RLECs report that using a single trunk through AT&T Kentucky causes problems with "inaccurate measurement, unidentified traffic, and missing settlements." [*Id.*] In addition, the RLECs have made "significant capital expenditures" to identify and bill for their own telecommunications traffic. [*Id.*] Based on these arguments, the Commission ordered the use of dedicated trunks once the telecommunications traffic exceeded a certain level – "DS1," or, 1.544 million bits per second. [Record No. 34, p. 28]

The Commission's determination was within the dictates of § 251. A local carrier is only required to provide the wireless carrier's requested form of interconnection if it is "economically reasonable." *See* 47 C.F.R. 20.11(a). The Commission was presented with evidence that a single trunk for all traffic was economically unreasonable. The Commission accepted this evidence and determined that "RLECs should have the ability to adequately and independently

verify local traffic being exchanged through an intermediary." *Order*, Case Nos. 2006-00215, et al. (Ky. Pub. Serv. Comm'n, Dec. 22, 2006).

The Commission's decision is supported by facts and testimony on this issue from numerous representatives of the RLECs during the administrative hearings. [Record No. 32] Further, such factual determinations are not subject to exhaustive or hyper-critical review by a federal district court. Reversal is only warranted where such determinations were "arbitrary and capricious." *Quick Commc'ns, Inc. v. Mich. Bell Tel. Co.*, 515 F.3d 581, 584 (6th Cir. 2008). Determining that the Wireless Carriers' preferred form of interconnection is not economically reasonable for the RLECs was neither arbitrary nor capricious, based on the evidence in the record. A business's inability to identify and control the service it provides to its customers is a problem. Thus, the Commission had the authority and factual basis to order dedicated trunks.

The brunt of the Wireless Carriers' challenge comes from a 1996 FCC decision. [Record No. 29, p. 24] The quoted language provides that,

> Regarding the issue of interconnecting "directly or indirectly" with the facilities of other telecommunications carriers, we conclude that telecommunications carriers should be permitted to provide interconnection pursuant to section 251(a) based upon their most efficient technical and economic choices.

*See In the Matter of Implementation of the Local Competition Provisions of the Telecomms. Act of 1996*, 11 F.C.C.R. 15499, para. 997 [hereafter, the "*First Report & Order*"]. However, this language simply reiterates the general duty contained in § 251(a) that all carriers have to provide interconnection. *See* 47 U.S.C. § 251(a). In light of the fact that several subsequent subparts of § 251 limit and/or expand the duty of interconnection pursuant to subpart (a), the quoted language adds little to the Wireless Carriers' argument. Section 251(a) is a general duty with

-5-

many statutory limitations, depending on the type of carrier.  In addition, the relevant regulatory language does not contradict the statutory language – it clarifies that the method of interconnection should skew in favor of the requesting carrier unless extenuating circumstances exist.  *See* 47 C.F.R. § 20.11.  The Wireless Carriers are not guaranteed an absolute right of interconnection preference.  As previously noted, a state commission may reject a wireless carrier's preferred method of interconnection if it is not economically reasonable.

The Wireless Carriers also raise concerns with the specific level of threshold traffic – DS1 – established by the Commission.  Arguing that the level has no basis in the record, they contend that the choice of DS1 as a threshold level is arbitrary and capricious.  Indeed, neither the RLECs nor the Commission provide any support for a DS1 threshold, as opposed to other established levels.  Instead, the Commission simply relies on the fact that it has previously determined threshold traffic levels, and asserts that it should be afforded latitude in making such decisions.

Although the Commission has the authority to order dedicated trunks and set a threshold level, the threshold level must have some factual basis.  Similarly, the RLECs have provided evidence that a single trunk is not economically reasonable, but they have not established that a DS1 threshold specifically – as opposed to DS2 or DS3 – is necessary.  The deferential standard of review afforded to a state commission's factual determinations is not so expansive as to forgive the absence of any factual support.  The Commission, rather than this Court, possesses the appropriate expertise to make this determination.  In fact, the DS1 threshold may very well be the most appropriate level at which traffic can be managed.  However, without a

-6-

delineation with some supporting facts, even the most deferential review of the Commission's determination is impossible. Therefore, on remand, unless the Commission alters this determination, the Commission must provide factual support for a DS1 threshold.

### B. RLEC Obligations for Costs Incurred Outside of Network Boundaries

The Wireless Carriers also challenge the apportionment of certain costs involved in transporting telecommunications traffic. When a call is made from a cell phone to a landline or vice versa, the traffic travels along the networks of the wireless provider, the landline provider, and perhaps even a third-party carrier in the case of indirect interconnection. The Wireless Carriers contend that the RLECs must bear all costs of transporting a call originating with an RLEC and terminating to a Wireless Carrier. The Wireless Carriers do not dispute that they, in turn, bear the costs of transporting a call originating with a Wireless Carrier and terminating to an RLEC.

The Commission and RLECs counter with a different theory of cost apportionment: an originating carrier is not responsible for the cost of transporting its originating calls all the way to the terminating carrier's network facility. Instead, they assert that an originating carrier is responsible for the cost of transporting its originating calls up until the interconnection point it has negotiated with the terminating carrier. The RLECs' and the Commission's theory relies upon interconnection obligations under 47 U.S.C. § 251(c), while the Wireless Carriers' theory relies upon transport and termination obligations under 47 U.S.C. §§ 251(b) and 252(d)(2).

The interconnection point is, as its name suggests, the physical point at which two carriers' networks meet. Under § 251(c), local exchange carriers have "[t]he duty to provide .

. . interconnection with the local exchange carrier's network at any technically feasible point within the [local exchange] carrier's network."  47 U.S.C. § 251(c)(2)(B).  The corresponding regulatory definition of an interconnection point is "a point of interconnection between two networks, designated by two telecommunications carriers, at which one carrier's responsibility for service begins and the other carrier's responsibility ends."  47 C.F.R. § 51.5.  The RLECs and the Commission insist that both the statutory and regulatory provisions serve as the basis for their argument that the "point of interconnection is the same as the billing point."  [Record No. 32, p. 17]  However, neither provision contains any mention of financial obligations that accompany the designation of a physical point of interconnection.  The fact that the local exchange carriers in this case (*i.e.*, the RLECS) are interconnecting on a point within their own network is undisputed.  Thus, § 251(c)(2)(B) simply restates the undisputed point that the RLECs were able to choose an interconnection point on their own network.  Similarly, 47 C.F.R. § 51.5 restates the definition of "interconnection point" as a physical point of demarcation.

The RLECs base their argument from a portion of a 2001 FCC order, *In the Matter of Application of Verizon Penn., Inc., Verizon Long Distance, Verizon Enter. Solutions, Verizon Global Networks Inc. & Verizon Select Servs., Inc. for Authorization to Provide In-Region, InterLATA Servs. in Penn.*, 16 F.C.C.R. 17419, para. 100 (2001).  However, this order detracts from the RLECs' position by pointing out that, at the time, the issue of conflating the physical point of interconnection with the billing point was an "open" one.  *Id.*  As a result, the FCC is careful to highlight a distinction made "between the physical [point of interconnection] and the point at which [the parties] are responsible for the cost of interconnection facilities."  *Id.*  Thus,

the cited FCC order provides no basis for assuming that the negotiation of a physical interconnection point automatically determines the carriers' financial obligation as well.  Nor, as the RLECs and the Commission suggest, did the Wireless Carriers specifically negotiate the interconnection point as the billing point.  The RLECs cite a portion of the Commission-approved interconnection agreement between the parties, defining "interconnection point" as "a demarcation point on the incumbent network of the [RLEC] . . . for the delivery of traffic pursuant to the terms and conditions of [the] Agreement."  [Record No. 32, p. 21]  This language, like the language of 47 C.F.R. § 51.5, does not imply financial obligations.

In fact, the 1996 Act contains a specific provision that identifies pricing standards for duties mentioned in § 251(c).  Specifically, § 252(d)(1) requires that a state commission determine "the just and reasonable rate for interconnection . . . based on the cost . . . of providing interconnection."  *Id*. at § 252(d)(1).  In all their discussion of § 251(c) and the designation of the interconnection point as the billing point, the RLECs and the Commission make no reference to the pricing provision contained in the statute itself.  Reading any type of financial obligation into the interconnection duty outlined in § 251(c)(d) would render § 252(d)(1) extraneous.

This interpretation of § 251(c)(2) is consistent with those of federal appellate courts that have also considered the issue.  For example, in *MCIMetro Access Transmission Servs., Inc. v. BellSouth Telecommc'ns, Inc.*, 352 F.3d 872 (4th Cir. 2003), the Fourth Circuit rejected a similar argument made by an incumbent local exchange carrier.  Citing a previous Notice of Proposed Rulemaking from the FCC, that court determined that "the term 'interconnection' under section 251(c)(2) refers only to the physical linking of two networks for the mutual exchange of traffic."

-9-

*MCIMetro*, 352 F.3d at 879 (internal quotation omitted).   As a result, the delivery of telecommunications traffic from an originating caller's network to the interconnection point was not a "cost of interconnection" under § 251(c)(2), but a transport and termination cost governed by reciprocal compensation under § 251(b).   *Id*. at 879-880 ("Including the transport and termination of traffic within the meaning of section 251(c)(2) would result in reading out of the statute [duties] under section 251(b)(5).").

In *Atlas Tel. Co. v. Okla. Corp. Comm'n*, 400 F.3d 1256 (10th Cir. 2005), the Tenth Circuit rejected another overly broad interpretation of 251(c): "[A]ccepting the RTCs' interpretation of § 251(c) would compel us to assume too much and ignore altogether the express language of the statute."   *Atlas*, 400 F.3d at 1265.   And in *Sw. Bell Tel. Co. v. Pub. Utils. Comm'n of Tex.*, 348 F.3d 482 (5th Cir. 2003), the Fifth Circuit affirmed a district court's finding that a carrier's transport costs were governed by reciprocal compensation terms rather than interconnection terms.   *Sw. Bell*, 348 F.3d at 487.

The RLECs and the Commission argue that these cases are factually distinguishable because they involved interconnection points that were located outside of the incumbent carrier's network.   Here, the interconnection point lies within the incumbent carriers' – the RLECs' – network.   Based on this observation, the RLECs argue that the interconnection point is "not merely a theoretical location; it is the specific demarcation point where there is a linking of the CMRS Provider and RLEC networks for the delivery of traffic pursuant to the terms and conditions of the Agreement."   [Record No. 32, p. 21]   This argument would encourage a definition of "interconnection point" that changes as the interconnection point itself changes

-10-

locations.  Such a definition would be nonsensical.  The location of the interconnection point within an incumbent carrier's network does not automatically place more significance on that point as a point of billing or any other financial obligation.  This distinction holds no significance within the statute, the regulation, or relevant judicial decisions.

The RLECs and the Commission simply cannot escape the fact that this issue falls under § 251(b), rather than § 251(c).  A local exchange carrier has a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5).  A subsequent section, § 252, sets out the actual pricing standards for such transport and termination.  *Id.* at § 252(d)(1) - (2).  Any reciprocal compensation agreement must provide for "the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier."  *Id.* at § 252(d)(2)(A)(i).  This statutory language is further supported by 47 C.F.R. § 51.703(b) which provides that, "[a] LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network."

All provisions support the Wireless Carriers' contention that, regardless of the location of the interconnection point, the RLECs may not charge the Wireless Carriers for transport costs on RLEC-originated calls.  The FCC agrees.  "Pursuant to Section 51.703(b), a LEC may not charge [wireless] providers for facilities used to deliver LEC-originated traffic that originates and terminates within the same MTA."  *TSR Wireless, LLC v. US West Commc'ns, Inc.*, 15 F.C.C.R. 11166, para. 10 (2000).  As a result, the Commission's decision on this issue will be reversed.

### C.      Reciprocal Compensation Obligations for IXC Traffic

As discussed above, reciprocal compensation obligations apply to "the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). The parties' final dispute concerns whether another type of telecommunications traffic, "interexchange" ("IXC") traffic, qualifies for reciprocal compensation under the 1996 Act. In this dispute, landline phone calls from RLEC customers are dialed as long-distance calls and delivered to the Wireless Carriers' customers *via* a third-party long-distance, or IXC, carrier. In the *March 2007 Order*, the Commission found that IXC traffic was not subject to reciprocal compensation because it originated with an IXC carrier rather than with either the RLECs or the Wireless Carriers. The Wireless Carriers challenge this ruling and argue that all IXC traffic, regardless of whether it is routed through a third party, is subject to reciprocal compensation.

"Telecommunications traffic" is defined as "traffic exchanged between a LEC and a [wireless] provider that, at the beginning of the call, originates and terminates within the same Major Trading Area." 47 C.F.R. § 51.701(b). The RLECs argue that the calls here do not fall within this definition because they are not exchanged between an LEC and a wireless provider. Instead, they are routed from an IXC carrier to the Wireless Carriers. The RLECs contend that, without an LEC involved in the traffic exchange, no duty of reciprocal compensation exists. In support, they cite a portion of the FCC's *First Report & Order*: "[R]eciprocal compensation for transport and termination of calls is intended for a situation in which two carriers collaborate to complete a local call. In this case, the local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call." *First*

*Report & Order*, at para. 1034.  This cited language serves as a basis for the "access charge" regime that the RLECs urge governs the IXC traffic.  Under the access charge regime, an interexchange carrier, or, third-party long-distance carrier, "pays originating access charges to carriers to originate calls, and terminating access charges to terminate calls."  [Record No. 32, p. 33]  Assuming that the access charge regime applies, the problem is that the payment of reciprocal compensation to the Wireless Carriers would allow "double recovery" for the Wireless Carriers.  The Wireless Carriers would be able to recover first from the IXC carrier for the transmitted calls.  Then, under a reciprocal compensation scheme, the RLECs would reimburse the Wireless Carriers a second time for that same traffic.

The access charge regime is inapplicable here.  Paragraphs 1033 and 1034 of the *First Report & Order* refer to traffic between an LEC and a non-wireless carrier.  The FCC lays out separate provisions for traffic exchanged between an LEC and a wireless carrier.  This distinction is preserved in the Code of Federal Regulations as well.  Title 47 of the Code of Federal Regulations, § 51.701(b), imposes reciprocal compensation obligations on two different types of relationships.  The first subsection, § 51.701(b)(1), identifies the included traffic between LECs and non-wireless carriers: "Telecommunications traffic exchanged between a LEC and a telecommunications carrier other than a CMRS provider, except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access."  Under this provision, any traffic that is routed through an IXC carrier, or third-party long-distance carrier, is exempt from reciprocal compensation obligations.  The language clearly creates such an exemption.  The subsequent section, §

-13-

51.701(b)(2), imposes reciprocal compensation obligations on traffic exchanged between LECs and wireless carriers, defined as "telecommunications traffic exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same Major Trading Area." There is no exemption here for IXC carriers. Thus, although an access charge regime may be applicable to exchange carriers involved in LEC to non-wireless carrier traffic, the same regime is not applicable to LEC to wireless carrier traffic.

Caselaw supports this conclusion. In *Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n*, 490 F.3d 619 (8th Cir. 2007), the Eighth Circuit was faced with an identical issue of "whether land-line telephone calls to cell phones within the same locale are treated as local calls . . . even when such calls [are] routed through a long-distance provider." *Alma*, 490 F.3d at 620. Relying on its own precedent, the court determined that "calls within the major trading area were subject to reciprocal compensation, regardless of whether they had to be routed through the interexchange carrier." *Id.* at fn. 9.

In *Atlas*, the Tenth Circuit analyzed the statutory and regulatory language and determined that the access charge regime did not apply to LEC to wireless calls. "[T]he FCC was undoubtedly aware of issues arising when access calls are exchanged, yet chose not to extend a similar exception to LEC-CMRS traffic." *Atlas*, 400 F.3d at 1265. Finding that the inclusion of the access charge language in § 51.701(b)(1) was significant in addressing the exemption of the same language in § 51.701(b)(2), the court stated that "[w]hen in exercising its quasi-legislative authority an agency includes a specific term or exception in one provision of a regulation, but excludes it in another, we will not presume that such term or exception applies

-14-

to provisions from which it is omitted." *Id.* The court rejected the same argument presented here, finding that "[n]othing in the text of [the statute and regulations] provides support for the [rural carriers'] contention that reciprocal compensation requirements do not apply when traffic is transported on an IXC network." *Id.* at 1264. In short, the RLECs' and Commission's position is not supported by the statute, regulations, or caselaw.

Unlike factual determinations, legal determinations of a state agency are subject to a *de novo* review. Federal courts "review state agency interpretations of the Telecommunications Act *de novo*, according little deference to the Commission's interpretation of the Act." *Lucre, Inc. v. Mich. Bell Tel. Co.*, 238 F. App'x 18, 19 (6th Cir. 2007) (internal quotation omitted). Although the RLECs argue otherwise, the question of whether the traffic here is subject to reciprocal compensation obligations is a question of law governed by the Commission's interpretation of the 1996 Act. Therefore, the Commission's decision on this issue is entitled to very little deference. Evidence presented by the RLECs, like the testimony from an RLEC representative, only serves to support the undisputed point that IXC carriers deliver traffic to the Wireless Carriers. This factual garnish does not lend more credibility or weight to the Commission's interpretation of the law. As a result, the Commission's decision on this issue will be reversed.

## II.     Conclusion

Although the Commission was within the bounds of the 1996 Act in ordering dedicated trunks, the DS1 threshold level adopted by the Commission lacks factual support in the record. As a result the matter will be remanded for further consideration of this issue. Additionally, the

-15-

Commission's decisions regarding transit costs incurred outside RLEC network boundaries and reciprocal compensation for IXC traffic violate provisions of the 1996 Act. Accordingly, it is hereby

      **ORDERED** that

      1.    The issue of the DS1 threshold is **REMANDED** to the Kentucky Public Service Commission for further consideration.

      2.    The Kentucky Public Service Commission's decisions regarding transit costs incurred outside RLEC network boundaries are **REVERSED**.

      3.    The Kentucky Public Service Commission's decisions regarding reciprocal compensation for IXC traffic are **REVERSED**.

      4. With respect to arbitration proceedings 2006-00215, 2006-00217, 2006-00218, 2006-00220, 2006-00252, 2006-00255, 2006-00288, 2006-00292, 2006-00294, 2006-00296, 2006-00298, and 2006-00300, the Kentucky Public Service Commission shall direct the Wireless Carrier and RLECs to submit new conformed interconnection agreements consistent with this Memorandum Opinion and Order. Further, the Kentucky Public Service Commission shall approve all such new conformed interconnection agreements consistent with the Court's Memorandum Opinion and Order.

      5.    The parties are **ENJOINED** from enforcing provisions of the interconnection agreements previously negotiated in reliance on the Commission's erroneous decisions.

      This 20th day of May, 2009.



Signed By:

*__Danny C. Reeves__*  DCR

**United States District Judge**